**UNITED STATES of America,**
**Plaintiff,**

v.

**Johnny Lee BROWN, Defendant.**

**No. 98–CR–80923.**

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 22, 1999.

Mark Osler, Asst. U.S. Attorney, Detroit, MI, for Plaintiff.

David Tholen, Federal Defender, Detroit, MI, for Defendant.

## OPINION AND ORDER DENYING DEFENDANT'S MOTIONS TO SUPPRESS EVIDENCE OF WARRANTLESS SEARCH AND TO DISMISS COUNT II OF INDICTMENT

ROSEN, District Judge.

### I. *INTRODUCTION*

Defendant Johnny Lee Brown was indicted on November 5, 1998 on two counts

of felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Count I charges Defendant with possessing a Lorcin pistol on May 1, 1997, while Count II charges him with possessing two rifles and a shotgun on October 23, 1998. Defendant previously was convicted in Michigan state court of receiving stolen property in violation of Mich. Comp. Laws § 750.535 and possession of a stolen motor vehicle in violation of Mich. Comp. Laws § 257.254, offenses for which he received a 5–10 year sentence. The State of Michigan terminated his parole on August 1, 1994.

Two motions presently are pending before the Court: (1) Defendant's Motion to Suppress Evidence of Warrantless Search filed on February 17, 1999; and (2) Defendant's Motion to Dismiss Count II of Indictment filed on March 8, 1999. In the first of these motions, Defendant asks the Court to suppress the three firearms seized on October 23, 1998—the weapons forming the basis of Count II of the Indictment—on the ground that the guns were seized during an invalid protective sweep conducted before Defendant consented to a search of his residence. In the latter motion, Defendant argues that he cannot be prosecuted under 18 U.S.C. § 922(g)(1) for possession of firearms on October 23, 1998 because his civil rights had been fully restored by operation of state law prior to that date.

In response, the Government asserts that the seizure of the three firearms on October 23, 1998 was valid under the doctrines of protective sweep, consent, and inevitable discovery. The Government further argues that Michigan law continues to encumber Defendant's right to carry a firearm, and thus Defendant remains subject to prosecution under 18 U.S.C. § 922(g)(1).

The Court conducted a hearing on Defendant's motions on April 29, 1999, at which time the Court heard argument regarding the Motion to Dismiss Count II. However, the evidentiary hearing on Defendant's Motion to Suppress was adjourned due to the unavailability of the Government's primary witness, Alcohol, Tobacco, and Firearms ("ATF") Special Agent Gerald Woodard. Following an additional July 1, 1999 hearing, at which Agent Woodard testified, the Court ordered the submission of supplemental briefs on the law governing protective sweeps.[1] Defendant timely filed his supplemental memorandum on July 9, 1999, to which the Government responded on July 23, 1999. Having heard the arguments of counsel and the testimony of Agent Woodard, and having reviewed the briefs and supporting documents submitted by the parties, the Court is now prepared to rule on Defendant's motions. For the reasons set forth below, the Court denies both of these motions.

## II.  *FACTUAL BACKGROUND*

On October 20, 1998, Magistrate Judge Donald Scheer issued an arrest warrant for Defendant based on a Complaint issued that day charging Defendant with being a felon in possession of a firearm on May 1, 1997, the charge that constitutes Count I of the current Indictment. Shortly thereafter, a confidential source contacted ATF Special Agent Woodard and informed him that Defendant was residing at 14216 Saratoga in Detroit, Michigan. On the morning of October 23, 1998, Agent Woodard paged Defendant to confirm his presence at the Saratoga address and Defendant, who was cooperating with Agent Woodard, returned the page. Agent Woodard and approximately eight other ATF agents then proceeded to the Saratoga residence to execute the arrest warrant.

Upon arriving at the residence, the agents knocked on the door and announced their presence. When Defendant opened

---

1. For purposes of the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.,* Defendant stipulated at the July 1, 1999 hearing to the exclusion of all time needed to resolve the pending motions due to the complexity of the issues raised in these motions. *See* 18 U.S.C. § 3161(h)(8)(B)(ii).

the door, Agent Woodard informed Defendant that he had an arrest warrant, and Defendant responded that he would come with the agents but that he needed to put on some clothes. Defendant then let the agents in the house. As Agent Woodard read Defendant his rights, searched him, and placed him in handcuffs, the other agents conducted a security sweep of the house. During the course of this security sweep, the agents discovered two rifles and a shotgun in plain view in an upstairs room. These firearms found on October 23, 1998 form the basis for Count II of the Indictment.

While the security sweep was ongoing, Agent Woodard remained downstairs with Defendant and escorted him into the kitchen. Agent Woodard asked Defendant whether anything in the house might pose a danger to the agents, and Defendant responded that there were some firearms upstairs. [7/1/99 Hearing Tr. at 22.]² Defendant then agreed to execute an ATF "Consent to Search" form. [Government's Brief in Response to Defendant's Motion for Suppression, Ex. 3.]

The evidentiary record fails to establish whether Defendant signed the "Consent to Search" before or after the ATF agents discovered the firearms during their sweep. Although Agent Woodard speculated at the July 1, 1999 hearing that Defendant gave his consent prior to this discovery, the Agent's own testimony reveals his lack of knowledge on this point, as he remained downstairs with Defendant while the other agents performed their upstairs search:

> THE COURT: Let me ask you some questions here, Mr. Woodard. I am not clear in my own mind exactly what the time line progression was of when all this happened .... And I want to focus particularly on when the search was conducted.

> \*    \*    \*    \*    \*    \*

THE COURT: [A]t some point he told you about the firearms.

AGENT WOODARD: Yes, he did.

THE COURT: When was that?

AGENT WOODARD: That was after I asked him was there anything that would be considered dangerous in the house ....

THE COURT: Was this while the protective sweep was going on?

AGENT WOODARD: That is correct, yes.

THE COURT: Had the guns been found yet?

AGENT WOODARD: I don't believe so. I didn't find out that the[re] were guns up there until after the protective search was completed and the agents came back down and told me there w[ere] firearms downstairs.

THE COURT: So they had found the guns?

AGENT WOODARD: Yes.

> \*    \*    \*    \*    \*    \*

THE COURT: Who seized the guns?

AGENT WOODARD: The agents that were doing a search. They did not—we had to take a picture of the firearms in place.

THE COURT: In place?

AGENT WOODARD: Yes.

THE COURT: At what point did you see the guns?

AGENT WOODARD: Actually, I stayed with Mr. Brown. That was after the officers brought the guns downstairs because I assisted in doing—writing up the evidence for the guns.

THE COURT: All right. At what point did he sign the consent; after the guns were found or before?

AGENT WOODARD: It was during.

THE COURT: During what?

---

**2.** Agent Woodard testified that in response to his question whether there was anything dangerous in the house, Defendant first respond- ed no, but then told Agent Woodard about the firearms "up inside the residence." [Hearing Tr. at 8.]

AGENT WOODARD: He signed the Consent Form during the search of the residence.

THE COURT: Was that before [or] after the guns were found.

AGENT WOODARD: It was pretty close around the same time. I believe it was before the guns w[ere] found.

\* \* \* \* \* \*

THE COURT: Was it signed, was the consent signed before or after he told you about the guns?

AGENT WOODARD: That consent was signed after I had already knew there was a gun—there [were] some guns there.

[Hearing Tr. at 21–25.].[3]

After leaving the Saratoga residence, Defendant was taken directly to ATF headquarters, where he was once again advised of his rights and asked to make a statement. Defendant then executed a written waiver of his rights to remain silent and to advice of counsel and signed a written affidavit prepared by Agent Woodard. [Government's Brief in Response to Defendant's Motion for Suppression, Ex. 4.] This affidavit states:

I advised S/A Woodard that I was at 14216 Saratoga, Detroit, MI. At approximately two to three minutes later S/A Woodard along with other agents and officers arrived at my residence. I let the officers inside the residence and told them that I had three (3) firearms for personal safety.

[Ex. 4 at 3.]

### III. ANALYSIS

#### A. Defendant's Motion to Suppress

##### 1. The Legal Framework Governing Determination of This Motion

It is well established that the Fourth Amendment forbids only unreasonable searches and seizures. *Maryland v. Buie,* 494 U.S. 325, 331, 110 S.Ct. 1093, 1096, 108 L.Ed.2d 276 (1990). When determining the reasonableness of a particular search, courts must balance "the intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Id.* Given an individual's substantial privacy interests within his home, the Supreme Court has declared the principle that it is generally not reasonable to conduct an in-home search without a warrant issued on probable cause. 494 U.S. at 331, 110 S.Ct. at 1097. Under certain limited circumstances, however, the public interest permits such a search to proceed without a warrant or probable cause. *Id.*

Next, where a search exceeds the bounds of reasonableness under the Fourth Amendment, the exclusionary rule generally dictates that evidence seized during such a search is not admissible. *Murray v. United States,* 487 U.S. 533, 536, 108 S.Ct. 2529, 2533, 101 L.Ed.2d 472 (1988). This rule is intended to serve a deterrence function by ensuring that "the prosecution is not to be put in a better position than it would have been in if no illegality had transpired." *Nix v. Williams,* 467 U.S. 431, 443, 104 S.Ct. 2501, 2508, 81 L.Ed.2d 377 (1984). The exclusionary rule, however, is not inviolate; rather, exceptions such as the "independent source" doctrine and the "inevitable discovery" doctrine seek to ensure that "the prosecution is not put in a *worse* position simply because of some earlier police error or misconduct." *Id.*.

In the present case, the Government argues that the warrantless search of Defendant's residence—and the seizure of the three firearms discovered during that search—was lawful either as a reasonable

---

**3.** Despite this testimony, the Government disingenuously asserts that Agent Woodard "testified that this consent was signed *before* the guns were actually found." [Government's Supplemental Brief at 2 (emphasis in original).] In fact, Agent Woodard stated only his *belief* that consent was given before the guns were found. [Hearing Tr. at 24.] Indeed, Agent Woodard could not have known whether consent was given before or after the guns were found, because he remained downstairs with Defendant while the other agents conducted their upstairs sweep.

"protective sweep" or as the product of Defendant's free and voluntary consent to the search of his residence. Alternatively, even if this search was not lawful, the Government asks the Court to apply the "inevitable discovery" doctrine and rule that the firearms in question are admissible.

As discussed below, the Court finds that the firearms are admissible, although not precisely for the reasons urged by the Government. Accordingly, the Court denies Defendant's motion to suppress the evidence acquired in the warrantless search.

### 2. *Protective Sweep*

■ As its initial argument, the Government contends that the search of Defendant's residence was a permissible "protective sweep." In *Maryland v. Buie, supra,* the Supreme Court defined the parameters of a protective sweep incident to an in-home arrest:

> We agree with the State, as did the court below, that a warrant was not required. We also hold that as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces **immediately adjoining** the place of arrest from which an attack could be immediately launched. **Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene** . . . .
>
> We should emphasize that such a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, **is nevertheless not a full search of the premises,** but may extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.

*Buie,* 494 U.S. at 334–36, 110 S.Ct. at 1098–99 (emphasis added) (footnotes omitted); *see also United States v. Calhoun,* 49 F.3d 231, 234 n. 3 (6th Cir.1995) (stating that "a warrantless search of the [defendant's] apartment could be justified only if the officers had a specific, reasonable basis for believing . . . that they were in danger from persons inside, as analyzed in *Buie* "). Thus, a protective sweep may not extend beyond the area immediately adjoining the place of arrest unless the arresting officer reasonably believes, based on specific, articulable facts and reasonable inferences from those facts, that the additional area to be swept could harbor an individual posing a danger to the officer.

■ Applying this standard, the Court finds that the protective sweep in this case exceeded its permissible scope under the Fourth Amendment. As acknowledged by Agent Woodard at the evidentiary hearing, the protective sweep was not based upon any articulable suspicion, but rather was undertaken as a matter of standard ATF policy:

> THE COURT: You said he answered the door?
>
> AGENT WOODARD: Yes.
>
> THE COURT: He let you in, right?
>
> AGENT WOODARD: Yes.
>
> THE COURT: What happened then? What's the next thing that happened?
>
> AGENT WOODARD: I had advised him I had a warrant for his arrest.
>
> THE COURT: How many agents were with you?
>
> AGENT WOODARD: Approximately, eight agents.
>
> THE COURT: All right. And what were they doing while you were advising him?
>
> AGENT WOODARD: **As soon as I execute a[n arrest] warrant, it's proper procedure you immediately come in and conduct a security sweep.**
>
> THE COURT: Protective sweep?

AGENT WOODARD: That's correct. [Hearing Tr. at 21–22 (emphasis added).]

This testimony reveals that the ATF agents did not form a specific belief that Defendant's residence harbored a dangerous individual, but instead conducted a protective sweep of both the downstairs and upstairs as a matter of course.[4] To the extent this sweep covered areas beyond the immediate vicinity of the arrest, it exceeded the scope of a permissible sweep as defined in *Buie*. *See also United States v. Akrawi*, 920 F.2d 418, 421 (6th Cir.1990) (finding an impermissibly broad protective sweep where "the agents could point to no particular reason to support a reasonable belief that the second floor harbored a dangerous individual"). Accordingly, the Government's attempt to justify the warrantless search as a protective sweep must be rejected.

### 3. *Consent*

The Government next contends that Defendant consented to the search of the Saratoga residence prior to the discovery of the firearms. "A search may be conducted without a warrant if a person with a privacy interest in the item to be searched gives free and voluntary consent." *United States v. Riascos–Suarez*, 73 F.3d 616, 625 (6th Cir.1996) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 222, 93 S.Ct. 2041, 2043–44, 36

L.Ed.2d 854 (1973)). "It is the Government's burden, by a preponderance of the evidence, to show through 'clear and positive testimony' that valid consent was obtained." *Id.* (quoting *United States v. Scott*, 578 F.2d 1186, 1188 (6th Cir.1978)).

■ In this case, Defendant does not contest that he freely and voluntarily signed the ATF "Consent to Search" form while downstairs in the kitchen with Agent Woodard.[5] Thus, the inquiry becomes whether the Government can establish by a preponderance of the evidence that Defendant gave this consent to search *before* the ATF agents discovered the firearms upstairs during their protective sweep, so that the sweep can be justified as the product of Defendant's consent.[6]

Agent Woodard's testimony at the evidentiary hearing, while somewhat confusing, at best establishes that Defendant signed the "Consent to Search" form at some point *during* the protective sweep. The search itself apparently began prior to the consent, and Agent Woodard cannot credibly testify as to the exact timing of the consent in relation to the other agents' discovery of the firearms on the second floor of the residence, in light of his testimony that he remained downstairs with Defendant at all times during the sweep. In sum, there is simply no evidence linking the sweep and Defendant's consent to search his residence.[7]

---

**4.** The record does not contain sufficient facts from which a reasonably prudent officer could have inferred the possible presence of a dangerous individual at Defendant's residence. As acknowledged by Agent Woodard at the evidentiary hearing, Defendant cooperated in his arrest. [Hearing Tr. at 13.] Indeed, Defendant returned Agent Woodard's page on the morning of October 23, 1998 to inform the agent of his whereabouts. Moreover, Agent Woodard did not testify that he suspected a trap, or that he thought others might be present at the home.

**5.** Defendant's willingness to allow the ATF agents to enter the house while he got dressed cannot plausibly be construed as his "implied consent" to the subsequent search of the entire house.

**6.** To be accurate, it is not at all clear that the legality of the sweep turns upon—or, at any

rate, should turn upon—the precise timing of Defendant's consent versus the discovery of the weapons. In the Court's view, the reasonableness requirement of the Fourth Amendment arguably is satisfied by a consent given contemporaneously with a search, without the need for split-second determinations of "which came first." However, given its determination on other grounds that the firearms in question are admissible, the Court need not reach this difficult question in this case.

**7.** Indeed, as discussed below, it is this absence of any connection between Defendant's consent given to Agent Woodard and the contemporaneous sweep by the other ATF agents that permits application of the "inevitable discovery" doctrine in this case.

This absence of any connection between the consent and the search distinguishes this case from a Sixth Circuit decision cited by the Government, *United States v. Calhoun*, 49 F.3d 231, 234–35 (6th Cir. 1995). In *Calhoun*, a UPS employee discovered a package containing a kilogram of cocaine, and the police arranged for a controlled delivery to the addressee, Sean Johnson. When defendant Calhoun opened the door, identified herself as Sean Johnson, and signed for the package, the police immediately executed an arrest and conducted a pre-planned protective sweep of the apartment which produced no incriminating evidence.[8] Shortly thereafter, Calhoun signed a consent form giving the police authority to search the apartment and told the officers a shotgun was under a bed. After Calhoun signed the consent, the police conducted another, separate search of the apartment, seizing the firearm and other evidence.

On appeal of her conviction, Calhoun argued that the district court erred in denying her motion to suppress the weapon on the grounds that the pre-arranged protective sweep of her apartment was illegal and that this illegal search was instrumental in causing her to later consent to a second search. After first agreeing that the pre-arranged protective sweep was illegal, the Sixth Circuit rejected Calhoun's argument, finding that the subsequent valid consent search constituted an independent source for the seizure of the firearm:

> Although we agree with Calhoun [that] the sweep of her apartment was illegal, the evidence seized did not turn on the unauthorized sweep. Both sides agree that no evidence was obtained as a direct result of the illegal sweep. The government asserts that Calhoun's voluntary consent to the second search provided an independent source for the seizure of the firearm and the other evidence obtained. Calhoun's consent to the search was voluntary as evidenced

by her freely signing the consent form and by the testimony of the officers. *Calhoun*, 49 F.3d at 234 (internal footnote and citations omitted).

In contrast to *Calhoun*, where the officers obtained a consent and *then* conducted a second search *pursuant* to that consent, there is no evidence in the present case that the agents who discovered the firearms upstairs during the course of the protective sweep had any knowledge of Defendant's consent. Rather, the firearms in this case were seized in a protective sweep conducted concurrently with Defendant's consent, and not during a search conducted *pursuant* to this consent. Thus, it cannot be said here, as it was in *Calhoun*, that "the sweep did not yield incriminating evidence," *Calhoun*, 49 F.3d at 234, and that the disputed evidence instead was discovered solely through a subsequent lawful search. This factual distinction precludes the Court from finding a lawful consent search in this case.

### 4. *Inevitable Discovery*

Although, as discussed above, the Court finds *Calhoun* distinguishable, that decision nevertheless appears to support a finding of admissibility in this case. If, in the present case, the ATF agents had failed to find the firearms during their initial sweep of Defendant's residence, the factual distinction between this case and *Calhoun* would have disappeared. Having failed to discover the firearms, the other agents would soon have learned of their existence and Defendant's consent from Agent Woodard, who remained downstairs with Defendant during the sweep. At this point, the agents could have performed a second search pursuant to Defendant's consent and, under *Calhoun*, any evidence they found would have been admissible.

Plainly, there is no principled basis for reaching different results in this case and *Calhoun*, based solely on the fortuity of discovering or not discovering evidence during the initial sweep. In either case,

---

**8.** The police had neither an arrest warrant    nor a search warrant.

the defendant's free and voluntary consent should be given effect, so long as it is "not obtained on the basis of any information garnered during the illegal search." *Calhoun*, 49 F.3d at 234. To invoke the exclusionary rule in such circumstances would, contrary to the Supreme Court's admonition in *Murray, supra,* "put the police (and society) not in the *same* position they would have occupied if no violation occurred, but in a *worse* one." *Murray*, 487 U.S. at 541, 108 S.Ct. at 2535.

■ Through the related doctrines of "independent source" and "inevitable discovery," the courts have endeavored to avoid such anomalous results, and to ensure that the reach of the exclusionary rule does not exceed its rationale. As noted above, the *Calhoun* Court invoked the "independent source" doctrine to uphold the admission of evidence found in the second search, reasoning that the defendant's "voluntary consent to the second search," untainted by anything learned in the initial sweep, "provided an independent source for the seizure of the firearm and the other evidence obtained." *Calhoun*, 49 F.3d at 234. Similarly, the "inevitable discovery" doctrine provides that evidence found in an unlawful search "may be admitted if the government can show that the evidence inevitably would have been obtained from lawful sources in the absence of illegal discovery." *United States v. Leake*, 95 F.3d 409, 412 (6th Cir.1996) (citing *Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984)).

Relying largely on the *Nix* decision, the Sixth Circuit in *Leake* addressed the showing necessary to invoke this doctrine:

By its nature, the inevitable discovery doctrine requires some degree of speculation as to what the government would have discovered absent the illegal conduct. Speculation, however, must be kept to a minimum; courts must focus on "demonstrated historical facts capable of ready verification or impeachment." The burden of proof is on the government to establish that the tainted evidence "would have been discovered by lawful means."

*Leake*, 95 F.3d at 412 (citations omitted). The Sixth Circuit further explained:

[T]he inevitable discovery exception applies when the government can demonstrate either the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence or other compelling facts establishing that the disputed evidence inevitably would have been discovered. The inevitable discovery doctrine requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred. In evaluating whether evidence should be admitted under either the independent source or the inevitable discovery doctrines, courts should keep in mind the underlying question: whether granting establishment of the primary illegality, [the evidence has] been come at by the exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

*Id.* (internal quotations and citations omitted).

■ Applying these well-settled legal principles, the Court finds that the firearms in question are admissible under the inevitable discovery exception to the exclusionary rule. If the protective sweep had never occurred, and if the ATF agents therefore had not seen the firearms in plain view during that sweep, a review of the record reveals that the agents inevitably would have discovered the weapons through information learned—and consent gained—from Agent Woodard's separate and independent investigation. While the protective sweep was ongoing in other parts of the residence, Defendant, who was fully cooperating with the authorities, informed Agent Woodard that there were firearms upstairs, and then signed a consent form authorizing the search of his residence. Through this separate investi-

gation, the Government independently learned that firearms could be found upstairs in the residence. These weapons clearly would have been lawfully seized in a later search pursuant to the information and consent given by Defendant, but for the fact that they were first discovered during the protective sweep.

Moreover, the record is devoid of any evidence that Defendant's decisions to sign the "Consent to Search" form and to inform Agent Woodard about the firearms in the residence were in any way tainted or influenced by the fact that a protective sweep was in progress at the time, or by any information learned in that sweep.[9] Thus, there was no exploitation of the illegality of the sweep, and no advantage gained or evidence obtained from the sweep that would not otherwise have been discovered. Rather, the record evidence establishes that Defendant voluntarily allowed the agents into the house and then voluntarily consented to the search of his residence, after informing Agent Woodard that firearms could be found upstairs. In light of this information and consent, which inevitably would have led to the discovery of firearms in Defendant's residence, the Court holds that the firearms in question are admissible.

## B. *Defendant's Motion to Dismiss Count II of the Indictment*

In his second motion, Defendant asks the Court to dismiss Count II of the Indictment on the ground that his right to own and possess firearms was fully restored by operation of Michigan law three years after he fulfilled the conditions of his parole on August 1, 1994, thereby exempting him from prosecution under the federal felon-in-possession statute. As noted above, Count II charges Defendant with being a felon in possession of the three firearms seized from the Saratoga residence on October 23, 1998 in violation of 18 U.S.C. § 922(g)(1), which provides in relevant part:

It shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

Although § 922(g)(1) generally prohibits convicted felons from possessing firearms, this section must be read in conjunction with § 921(a)(20), which exempts from the definition of a "crime punishable by imprisonment for a term exceeding one year" those convictions for which a person has had civil rights restored under the state law of the prosecuting jurisdiction:

What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which

9. Indeed, the fact that Defendant gave his consent while the sweep was still in progress, rather than after the sweep had concluded (as happened in *Calhoun*), greatly reduces the concern in this case that the sweep might have created a "coercive atmosphere," *Calhoun*, 49 F.3d at 234, that factored into Defendant's consent. To the contrary, the concurrent nature of the consent and the sweep lend further support to the Court's conclusion that the two events were fully independent of each other.

The Court further observes that this case highlights the close relationship between the "independent source" and "inevitable discovery" doctrines. Arguably, if Defendant told Agent Woodard about the firearms *before* the other ATF agents discovered the weapons during their sweep, then the evidence would first have been discovered *lawfully* during Agent Woodard's investigation, and the "independent source" doctrine would apply. In contrast, if the weapons were first discovered during the sweep, before Defendant had advised Agent Woodard of them, then this evidence would have been discovered unlawfully, and the "inevitable discovery" doctrine would apply. *See United States v. Herrold*, 962 F.2d 1131, 1139–40 (3d Cir.) (comparing the two doctrines), *cert. denied*, 506 U.S. 958, 113 S.Ct. 421, 121 L.Ed.2d 344 (1992). Because the sweep and Agent Woodard's conversation with Defendant took place at virtually the same time, there is no way of knowing which of these two scenarios is the correct one.

the proceedings were held. Any conviction which has been expunged, or set aside or for which a person has been pardoned or *has had civil rights restored* shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

18 U.S.C. § 921(a)(20) (emphasis added). Thus, under § 921(a)(20), the Court must look to Michigan law to determine whether Defendant may be charged under the federal felon-in-possession statute. If Michigan law has restored Defendant's civil rights without expressly limiting his firearm privileges, § 922(g)(1) liability does not attach.

### 1. *Restoration of Civil Rights under § 921(a)(20)*

■ The question whether Michigan law restores a convicted felon's civil rights for purposes of § 921(a)(20) has been the subject of much consideration—and some confusion—in both the Eastern District of Michigan and the Sixth Circuit Court of Appeals. The inquiry begins with *United States v. Cassidy*, 899 F.2d 543, 549 (6th Cir.1990), where the Sixth Circuit interpreted the term "civil rights" as used in § 921(a)(20) to mean those rights accorded to an individual by virtue of his citizenship in a particular state, including the right to vote, the right to seek and hold public office, and the right to serve on a jury.[10] Applying this interpretation, the *Cassidy* Court adopted the following standard for determining the restoration of civil rights under state law:

Hence, if a "convicted felon" has his civil rights restored by operation of state law, with or without a certificate or order documenting the event, we must look to the whole of state law of the state of conviction to determine whether the "convicted felon" is entitled to vote, hold public office and serve on a jury and also whether the "convicted felon" is entitled to exercise the privileges of shipping, transporting, possessing or receiving a firearm.

*Id.* (footnote omitted).

Two years later, this Court had the opportunity to address the same question in *United States v. Hammonds*, 786 F.Supp. 650 (E.D.Mich.1992). Upon surveying the legislative history of the 1986 amendments to § 921(a)(20), this Court expressed its concern that the Sixth Circuit's analysis in *Cassidy* might create precisely the "glitch in the gun law" cited by members of Congress in their debates surrounding the enactment of the Firearms Owners' Protection Act of 1986 ("FOPA"). 786 F.Supp. at 656–61. In particular, under *Cassidy*, a state's restoration of "benevolent" civil rights wholly unrelated to fitness to own firearms, such as the right to vote or to serve on a jury, could render a convicted felon immune from prosecution under the federal felon-in-possession statute, unless the state expressly declared, either in a certificate of restoration or by statute, that convicted felons were prohibited from possessing firearms. Because this result appeared contrary to the intentions of both the Congress and the *Cassidy* Court, this Court held (1) that a state-law "restoration of civil rights" based on considerations unrelated to the fitness to own a firearm does not operate to exempt a prior convicted felon from the federal felon-in-possession statute, and (2) that the last sentence of § 921(a)(20) applies only in cases where a previously convicted felon has been issued a written document by a state official, or where there has been some other "affirmative" action by state authorities to restore the felon's civil rights. 786 F.Supp. at 668.

---

**10.** Although defendant Cassidy's civil rights had been restored by virtue of a "Restoration to Civil Rights" certificate he had received from the State of Ohio upon his release from prison, the Sixth Circuit nonetheless found that an Ohio statute restricting Cassidy's right to possess firearms brought him within the "unless" clause of § 921(a)(20), and thus rendered him subject to prosecution under the felon-in-possession statute. 899 F.2d at 544, 550.

Later the same year, in *United States v. Driscoll*, 970 F.2d 1472 (6th Cir.1992), *cert. denied*, 506 U.S. 1083, 113 S.Ct. 1056, 122 L.Ed.2d 362 (1993), the Sixth Circuit reviewed the decision in *Hammonds*, along with two other Eastern District cases addressing the same issue.[11] While acknowledging that this Court's analysis in *Hammonds* "has some merit," the *Driscoll* Court observed that "it seems to contradict our statement in *Cassidy* that a 'narrow interpretation that we look only to the document, if any, evidencing a restoration of rights, would frustrate the intent of Congress that we look to the whole of state law, including state law concerning a convicted felon's firearms privileges.' " *Driscoll*, 970 F.2d at 1478 (quoting *Cassidy*, 899 F.2d at 548). The *Driscoll* Court concluded that it was bound to follow its decision in *Cassidy*, and proceeded to consider whether defendant Driscoll's civil rights had been restored by operation of Michigan law.

Upon two independent grounds, the Sixth Circuit found that Driscoll's civil rights had not been sufficiently restored to exempt him from prosecution under § 922(g)(1). First, as called for in *Cassidy*, the Court inquired whether Michigan law restores the rights of felons to vote, hold public office, and serve on juries. While acknowledging the restoration of Driscoll's rights to vote and to hold public office,[12] the Sixth Circuit found that "Michigan does not restore the right of convicted felons to sit on a jury." *Driscoll*, 970 F.2d at 1478. In reaching this decision, the Sixth Circuit gave precedence to Michigan Court Rule 2.511(D)(2), which provides that convicted felons may be challenged for cause during jury selection,[13] over

Michigan's jury qualification statute, Mich. Comp. Laws § 600.1307a(1)(e), which disqualifies from service only those persons who are "under sentence for a felony at the time of jury selection." The Court explained this ruling by stating, "We do not believe that the Legislature could validly enact a statute in derogation of the Michigan Supreme Court's rule-making power to establish judicial procedure." *Driscoll*, 970 F.2d at 1478.

As an alternative ground for affirming Driscoll's conviction under § 922(g)(1), the Sixth Circuit cited Michigan's pistol licensing rules, which at the time prohibited convicted felons from obtaining a pistol license for eight years after release from incarceration. 970 F.2d at 1476 & n. 1. The Sixth Circuit found this a sufficient limitation on firearm rights to bring Michigan felons within the "unless" clause of § 921(a)(20), as it "indicates strongly that Michigan did not intend to help its felons overcome the federal presumption against allowing them to possess weapons." *Driscoll*, 970 F.2d at 1481; *see also United States v. Tinker*, 985 F.2d 241, 242 (6th Cir.1992), *cert. denied*, 507 U.S. 1040, 113 S.Ct. 1872, 123 L.Ed.2d 491 (1993).

### 2. The Froede Decision

A subsequent Michigan court decision and other changes in Michigan law, however, have called into question the viability of the Sixth Circuit's ruling in *Driscoll*. In *Froede v. Holland Ladder & Manufacturing Company*, 207 Mich.App. 127, 133, 523 N.W.2d 849, 852 (1994), *lv. denied*, 451 Mich. 874, 549 N.W.2d 565 (1996), the Michigan Court of Appeals expressly rejected the Sixth Circuit's decisions in *Driscoll* and *Tinker*, holding that "a former

---

**11.** *See United States v. Butler*, 788 F.Supp. 944 (E.D.Mich.1991) (Woods, J.); *United States v. Gilliam*, 778 F.Supp. 935 (E.D.Mich. 1991) (Gadola, J.).

**12.** Mich. Comp. Laws § 168.758b and Article 2, § 2 of the Michigan Constitution prohibit convicts from voting only while they are incarcerated. Similarly, Mich. Comp. Laws § 168.938 calls for the removal of a candidate or public office holder only if he is convicted

of a felony during his candidacy or term of office.

**13.** In addition, Michigan Court Rule 6.412(D)(2), which governs the selection of juries in criminal trials, provides that "[i]f, after the examination of any juror, the court finds that a ground for challenging a juror for cause is present, the court on its own initiative should, or on motion of either party must, excuse the juror from the panel."

felon's right to serve as a juror is restored once the sentence is completed." In reaching this decision, the Court of Appeals resolved the apparent conflict between Mich. Comp. Laws § 600.1307a(1)(e) and Michigan Court Rule 2.511(D)(2) as follows:

Defendants contend that the juror in question was unqualified to serve as a juror because of her status as a convicted felon. Pursuant to the jury selection statute, a juror is qualified to serve if, among other things, not "under sentence for a felony at the time of jury selection." Pursuant to court rule, a party may challenge for cause a juror who "has been convicted of a felony." Neither the jury selection statute nor the court rules expressly mandate that a convicted felon be disqualified per se from sitting on a jury in a civil case.

The apparent nonconformity between § 1307a(1)(e) and MCR 2.511(D)(2) must be resolved by determining whether juror qualifications fall within the ambit of the Michigan Legislature's mandate to enact substantive law or the Michigan Supreme Court's mandate to establish general rules of practice and procedure. Where there is a conflict between a statute and a court rule, the court rule prevails if it governs practice and procedure. It has been stated that juror qualifications are matters of legislative control. This finding is further supported by *United States v. Dahms*, 938 F.2d 131, 134 (C.A.9, 1991), that interpreted § 1307a(1)(e) to restore substantially and automatically a convicted felon's right to serve as a juror following a period of suspension during incarceration.

Relying on a line of federal cases that have interpreted MCR 2.511(D)(2) and § 1307a(1)(e) as not restoring a former felon's civil right to serve as a juror, defendants assert that once a trial court becomes aware of a juror's prior felony conviction, it must dismiss the juror, whether the juror is still under sentence or not. We disagree with this line of federal cases [including *Driscoll* and *Tinker*] holding that a former felon's civil right to serve as a juror is not restored once that felon is no longer under sentence.

207 Mich.App. at 130–31, 523 N.W.2d at 851 (citations omitted).

Returning to the present case, Defendant argues that the Court must follow the Michigan Court of Appeals' interpretation of Michigan law in *Froede*. In *Ziebart Intern. Corp. v. CNA Ins. Companies*, 78 F.3d 245, 250–51 (6th Cir.1996), the Sixth Circuit identified the circumstances under which a federal court should follow a state intermediate appellate court's interpretation of state law:

This Court has stated that such a decision, while lacking the controlling force of a decision of a state court of last resort, does serve as a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise. We may refuse to follow intermediate appellate court decisions where we are persuaded that they fail to reflect state law correctly, but we should not reject a state rule just because it was not announced by the highest court of the state, even if we believe that the rule is unsound.

78 F.3d at 250–51 (internal quotations and citations omitted).

Citing *Ziebart*, Defendant argues that by denying leave to hear an appeal in *Froede*, the Michigan Supreme Court impliedly affirmed that decision, leaving no reason to believe that Michigan's highest court would rule otherwise. In response, the Government argues: (1) that the *Froede* case and its potential effect on *Driscoll* were fully briefed as part of a petition for *en banc* review of the decision in *United States v. Gilliam*, 979 F.2d 436 (1992), which was denied on August 1, 1996;[14]

---

**14.** As noted above, Judge Gadola issued the District Court decision in *Gilliam* at approxi- mately the same time as this Court issued *Hammonds*. On appeal, the Sixth Circuit re-

and (2) that the Sixth Circuit has rejected a similar challenge to the continuing viability of *Driscoll* raised in light of another Michigan Court of Appeals decision, *People v. Legrone*, 205 Mich.App. 77, 517 N.W.2d 270 (1994), *lv. denied*, 447 Mich. 1043, 527 N.W.2d 520 (1994).[15]

Regarding the Government's first argument, the significance of the Sixth Circuit's denial of a petition for *en banc* review pales in comparison to the Michigan Supreme Court's denial of leave to appeal in *Froede* itself. Michigan's highest court had a direct opportunity to review the intermediate court's ruling in *Froede*, and elected not to do so.

As for the second argument, the Michigan Court of Appeals' decision in *Legrone* did not squarely address the question whether a felon's right to serve as a juror is restored upon completion of a sentence.[16] To the contrary, the *Legrone* Court, while citing *Driscoll* and *Gilliam*, expressly declined to take a position on this question because the parties themselves had neither raised nor argued the issue. 205 Mich.App. at 79 n. 1, 517 N.W.2d at 272 n. 1. Thus, when confronted with an attempt to rely on *Legrone* in a subsequent felon-in-possession case, the Sixth Circuit commented in an unpublished opinion that "Legrone does not alter our analysis ... because it does not address all the issues in Driscoll and it is not clear

that the Michigan Supreme Court would reach the same result." *United States v. Reiche*, 47 F.3d 1172, n. 1 (6th Cir. 1995).

The Sixth Circuit's observations regarding *Legrone* simply do not apply to *Froede*, where the Michigan Court of Appeals expressly addressed the Sixth Circuit's decision in *Driscoll* and then concluded, contrary to *Driscoll*, that "a former felon's right to serve as a juror is restored once the sentence is completed." The decision in *Froede* appears well-reasoned and, when given the opportunity to review this ruling, the Michigan Supreme Court denied leave to appeal. Accordingly, there is no "persuasive data" that the Michigan Supreme Court would reach a different conclusion, or that the Michigan Court of Appeals improperly interpreted Michigan law. *Ziebart, supra*, 78 F.3d at 250–51. The Court therefore accepts *Froede* as an accurate statement of the current Michigan law on a convicted felon's right to serve on a jury.[17]

### 3. *Caron and the "Unless" Clause of § 921(a)(20)*

Having found that *Froede* supercedes *Driscoll* with respect to the restoration of a felon's right to serve on a Michigan jury, and that Defendant's civil rights therefore have been restored within the meaning of § 921(a)(20) as construed by the Sixth Circuit in *Cassidy* and *Driscoll*,

---

versed and remanded Judge Gadola's decision in reliance on *Driscoll*. *United States v. Gilliam*, 979 F.2d 436 (1992), *cert. denied*, 507 U.S. 1034, 113 S.Ct. 1856, 123 L.Ed.2d 478 (1993). Gilliam was convicted on remand, and the Sixth Circuit affirmed in an unpublished decision. *United States v. Gilliam*, 86 F.3d 1156 (6th Cir.1996).

**15.** The Government also unconvincingly argues that the Michigan Supreme Court's failure to modify the court rules following *Froede* suggests that the Supreme Court does not accept that decision as an accurate statement of Michigan law. There is no inconsistency, however, in the law as stated in *Froede:* a convicted felon's right to serve on a jury is restored at the completion of his sentence, but a party still may challenge a felon for cause if it so desires.

**16.** *Legrone* upheld the defendant's conviction where a convicted felon was permitted to remain on the jury despite the prosecutor's challenge for cause.

**17.** The Court notes that two other District Courts recently reached the same result, concluding that they were bound to follow *Froede* rather than *Driscoll* as the most recent statement of Michigan law. *See United States v. Tait*, 54 F.Supp.2d 1100 (S.D.Ala.1999); *United States v. Bolton*, 32 F.Supp.2d 461 (S.D.Tex.1999). The Court further notes that the Sixth Circuit currently is considering the impact of *Froede* in *Hampton v. U.S.*, 191 F.3d 695 (6thCir.1999) a 28 U.S.C. § 2555 appeal certified by Judge Gilmore.

the Court next must determine whether Michigan law nonetheless restricts Defendant's firearm rights. As noted earlier, under § 921(a)(20), the restoration of a felon's civil rights overcomes his state-law conviction and renders him immune from prosecution under the federal felon-in-possession law, "unless such ... restoration of civil rights expressly provides that the person may not ship, transport, possess or receive firearms." Thus, the question becomes whether Michigan law triggers this "unless" clause by imposing firearm restrictions upon Defendant's restoration of civil rights.

Citing the "unless" clause of § 921(a)(20), the Court in *Driscoll* relied on a then-existing Michigan statutory restriction on a felon's right to obtain a pistol license as an alternate basis for affirming a conviction under § 922(g)(1). *Driscoll*, 970 F.2d at 1480–81. After *Driscoll* was decided, however, Michigan enacted a statute which expressly grants convicted felons the right to possess firearms under certain conditions:

> (1) Except as provided in subsection (2), a person convicted of a felony shall not possess, use, transport, sell, purchase, carry, ship, receive, or distribute a firearm in this state until the expiration of 3 years after all of the following circumstances exist:

> (a) The person has paid all fines imposed for the violation.

> (b) The person has served all terms of imprisonment imposed for the violation.

> (c) The person has successfully completed all conditions of probation or parole imposed for the violation.

Mich. Comp. Laws § 750.224f(1).[18]

Defendant correctly points out that he has satisfied all of the conditions of this statute, and that by October 23, 1998, more than 3 years had passed since his parole was terminated on August 1, 1994. As a result, Defendant argues that he cannot be prosecuted under the federal felon-in-possession statute for the three firearms seized on October 23, 1998, because both his civil rights and his right to possess firearms had been restored under Michigan law.

In response, the Government concedes that § 750.224f(1) restores some of Defendant's firearm privileges, but points out that Michigan law still prohibits a convicted felon from applying for a license to "carry a pistol concealed on the person" or "to carry a pistol, whether concealed or otherwise, in a vehicle operated or occupied by the applicant" for a period of eight years following conviction or incarceration. Mich. Comp. Laws § 28.426(1). Because, in the Government's view, Defendant's firearm rights have not been fully restored, the Government contends that Defendant remains subject to prosecution as a felon in possession under the "unless" clause of § 921(a)(20).

In *Caron v. United States*, 524 U.S. 308, 118 S.Ct. 2007, 141 L.Ed.2d 303 (1998), the Supreme Court had occasion to interpret this "unless" language.[19] In that case, the Supreme Court was confronted with a Massachusetts statutory scheme which permitted convicted felons to possess fire-

---

**18.** Subsection (2) of this statute lengthens the three-year period of prohibition set forth in subsection (1) to five years and imposes additional conditions for persons convicted of certain "specified felon[ies]," Mich. Comp. Laws § 750.224f(2), which in turn are defined as including drug and firearm offenses, breaking and entering, arson, and offenses that involve the use or threatened use of physical force, Mich. Comp. Laws § 750.224f(6). The Government does not contend that Defendant's

prior convictions included any of these "specified felonies."

**19.** As noted above, the second sentence of § 921(a)(20) provides, "Any conviction ... for which a person ... has had civil rights restored shall not be considered a conviction for purposes of this chapter, *unless such ... restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.*" (Emphasis added.)

arms after five years, but prohibited them from possessing handguns outside their homes or businesses. The parties agreed that petitioner Caron's civil rights had ` been restored within the meaning of § 921(a)(20), leaving only the question whether Massachusetts' continuing restriction on handgun possession triggered the "unless" clause of this provision and rendered Caron subject to prosecution as a felon in possession.

Caron argued, and the District Court agreed, that the "unless" clause allows a felon whose civil rights are restored to "possess what state law permits him to possess, and nothing more." 118 S.Ct. at 2011. Because Caron was charged with possessing rifles and shotguns but not handguns, he contended that the state's handgun restriction should not subject him to prosecution. In response, the Government argued that a state weapons limitation of any sort activates the uniform federal ban on possessing any firearms at all, even if the offender could legally possess certain guns under state law.

While conceding the "common sense" of Caron's proposed interpretation, the Supreme Court majority found that the language of § 921(a)(20) did not permit Caron's status as "convicted" or "not convicted"—and thus subject or not subject to federal prosecution as a felon in possession—to turn upon whether he had violated a particular Massachusetts firearm restriction. Rather, the Court held that the existence of a prerequisite "conviction" under the federal felon-in-possession statute is determined by reference to the general terms and conditions of the convicted felon's "restoration of civil rights," and not by the felon's subsequent conduct:

> The unless clause is activated if a restoration of civil rights "expressly provides that the person may not ... possess ... firearms." Either the restorations forbade possession of "firearms" and the convictions count for all purposes, or they did not and the convictions count not at all. The unless clause looks to the terms of the past restorations alone

and does not refer to the weapons at issue in the present case. So if the Massachusetts convictions count for some purposes, they count for all and bar possession of all guns.

118 S.Ct. at 2011 (citation omitted).

Given this "all-or-nothing" nature of the "unless" clause, the Court next considered the two possible constructions of this clause: "[e]ither it applies when the State forbids one or more types of firearms, as the Government contends; or it does not apply if state law permits one or more types of firearms, regardless of the one possessed in the particular case." 118 S.Ct. at 2011. The Court adopted the former interpretation, finding that the latter would "yield[ ] results contrary to a likely, and rational, congressional policy;" for example, "[i]f permission to possess one firearm entailed permission to possess all, then state permission to have a pistol would allow possession of an assault weapon as well." 118 S.Ct. at 2012. The Court further explained:

> While state law is the source of law for restorations of other civil rights ..., it does not follow that state law also controls the unless clause. Under the Government's approach, with which we agree, the federal policy still governs interpretation of the unless clause. We see nothing contradictory in this analysis. Restoration of the right to vote, the right to hold office, and the right to sit on a jury turns on so many complexities and nuances that state law is the most convenient source for definition. As to the possession of weapons, however, the Federal Government has an interest in a single, national, protective policy, broader than required by state law. Petitioner's approach would undermine this protective purpose.

*Caron,* 118 S.Ct. at 2012.

Justice Thomas dissented from this ruling, joined by Justices Scalia and Souter. The dissenters, like the majority, believed that the plain language of the "unless" clause resolved the question before the Court, but reached the opposite conclusion.

In particular, Justice Thomas maintained that limited state-law firearm restrictions should not count as the express prohibition required under the "unless" clause:

> The only restriction Massachusetts law placed on petitioner's possession of firearms was that he could not carry handguns outside his home or business. By prohibiting petitioner from possessing only certain firearms (handguns) in only certain places (outside his home or office), Massachusetts law did not expressly provide that petitioner could not possess firearms.

The plain meaning of § 921(a)(20) thus resolves this case. The Court, however, rejects this plain meaning on the basis of "a likely, and rational, congressional policy" of prohibiting firearms possession by all ex-felons whose ability to possess certain firearms is in any way restricted by state law. According to the Court, Congress could not have intended the "bizarre result" that a conviction would not count as a violent felony if a State only partially restricts the possession of firearms by the ex-felon. But this would not be a bizarre result at all. Under § 921(a)(20), state law limitations on firearms possession are only relevant once it has been established that an ex-felon's other civil rights, such as the right to vote, the right to seek and hold public office, and the right to serve on a jury, have been restored. In restoring those rights, the State has presumably deemed such ex-felons worthy of participating in civic life. Once a State makes such a decision, it is entirely rational (and certainly not bizarre) for Congress to authorize the increased sentences in § 924(e) only when the State additionally prohibits those ex-felons from possessing firearms altogether.

118 S.Ct. at 2013 (Thomas, J., dissenting) (citations omitted).[20]

### 4. *Applying Caron to This Case*

At first glance, *Caron* seems to require the denial of Defendant's motion to dismiss Count II of his indictment. Just as the Massachusetts statutory framework addressed by the Supreme Court in *Caron* imposed limits on an ex-felon's right to possess handguns, Michigan law similarly restricts the firearm privileges of former felons by prohibiting them from carrying concealed pistols or pistols in vehicles. Given the "all-or-nothing" approach adopted by the Court in *Caron*,[21] Michigan's limited firearm restrictions seemingly are sufficient to trigger the "unless" clause of § 921(a)(20), and therefore render Defendant subject to prosecution under § 922(g)(1). Under *Caron*, it apparently does not matter that Defendant did not violate any of the restrictions Michigan continues to impose on convicted felons, or that these restrictions are relatively minor in scope; all that matters is that Michigan does in fact impose such limits.[22]

---

**20.** The dissent's reference to "increased sentences" reflects the fact that Caron was challenging an increased sentence for his felon-in-possession convictions, and not the convictions themselves, as he admittedly had a California conviction that rendered him subject to prosecution under 18 U.S.C. § 922(g)(1). By arguing that his three Massachusetts convictions should not count under § 921(a)(20), Caron sought to avoid a sentence enhancement that would otherwise be dictated under 18 U.S.C. § 924(e). Because both § 922(g)(1) and § 924(e) refer to state "convictions," which in turn are defined by § 921(a)(20), both this case and Caron turn upon the proper construction of § 921(a)(20).

**21.** The Court notes with interest that the dissenters in Caron apparently did not quarrel with the majority's adoption of an "all-or-nothing" interpretation of § 921(a)(20), under which the mere *existence* of firearm regulations—or, in the dissenters' view, affirmative permission to possess firearms—is determinative, and not the precise nature or scope of this regulation (or permission). Rather, the majority and dissenters simply disagreed on which of the two possible "all-or-nothing" interpretations should be adopted.

**22.** Indeed, as observed above, the dissenters in Caron viewed the majority ruling in precisely this fashion, opining that it had the effect of "prohibiting firearms possession by all ex-felons whose ability to possess certain firearms is in any way restricted by state law." 118 S.Ct. at 2013 (Thomas, J., dissenting). As discussed below, this Court shares

In an effort to distinguish *Caron* and avoid this result, Defendant offers two arguments: (1) that Mich. Comp. Laws § 28.426 restricts only a felon's right to "*carry*" a concealed weapon, while the unless clause of 18 U.S.C. § 921(a)(20) refers to shipping, transporting, possessing or receiving firearms, rights that Mich. Comp. Laws § 750.224f(1) fully restores after 3 years; and (2) that *Caron* purportedly involved a single Massachusetts statute that both restored the firearm privileges of ex-felons and imposed restrictions on handgun possession, while Michigan's restoration of firearm privileges and restrictions on carrying concealed weapons are found in two separate statutes.

Both of Defendant's attempted distinctions, however, are defeated by the relevant case law. First, in another firearms case from the same session as *Caron*, the Supreme Court held that the term "transport," as used in federal firearms statutes, "is a broader category that includes 'carry' but also encompasses other activity." *Muscarello v. United States*, 524 U.S. 125, 118 S.Ct. 1911, 1917, 141 L.Ed.2d 111 (1998).[23] Thus, the term "transport" as used in the "unless" clause of § 921(a)(20) encompasses restrictions on a convicted felon's right to "carry" firearms, such as the prohibitions on carrying concealed weapons or carrying pistols in vehicles as set forth in Mich. Comp. Laws § 28.426.

Defendant's second argument, although presenting a closer question, ultimately is also foreclosed by the governing case law. To be sure, the plain language of § 921(a)(20)—which refers to "such restoration"—lends support to Defendant's argument by suggesting that the "unless" clause is triggered only when the same state statute both restores a felon's civil rights and also encumbers his right to ship, transport, possess, or receive firearms. Moreover, this Court plainly is sympathetic to this view, given its previously expressed concern in *Hammonds, supra,* that state statutes having nothing to do with an ex-felon's firearm privileges might nevertheless operate to preclude a former felon's prosecution under 18 U.S.C. § 922(g)(1), by restoring his "benevolent" civil rights while remaining silent on his right to possess firearms. Here, the converse concern is raised: namely, that a state statute expressly restoring an ex-felon's firearm privileges, as Mich. Comp. Laws § 750.224f(1) does, might nevertheless fail to shield an ex-felon from prosecution under § 922(g)(1) because of a limited firearm restriction found in an altogether different and unrelated state statute.[24] In either case, the federal felon-in-possession law runs counter to the state's expressed intention—that, respectively, a convicted felon's firearm privileges should not or should be restored.

this view of the breadth of the decision in *Caron*, particularly when taken in combination with Sixth Circuit precedents.

**23.** *Muscarello* addressed the question whether the phrase "carries a firearm" as used in 18 U.S.C. § 924(c)(1) is limited to carrying a firearm on one's person, or also includes the possession and conveying of firearms in a vehicle that the person accompanies.

**24.** In *Hammonds*, this Court quoted with approval from *United States v. Erwin*, 902 F.2d 510 (7th Cir.), *cert. denied*, 498 U.S. 859, 111 S.Ct. 161, 112 L.Ed.2d 127 (1990), in which the Seventh Circuit construed the final sentence of § 921(a)(20) as stating an "anti-mousetrapping rule," so that "[i]f the state sends a felon a piece of paper implying that he is no longer 'convicted' and that *all* civil rights have been restored, a reservation in a corner of the state's penal code can not be the basis of a federal prosecution." *Hammonds*, 786 F.Supp. at 662 (quoting *Erwin*, 902 F.2d at 512–13.) Although *Erwin* suggests that this "anti-mousetrapping" protection is unnecessary when "the state sends no document granting pardon or restoring rights," because under such circumstances "there is no potential for deception," *Erwin*, 902 F.2d at 513, the present case arguably indicates otherwise. Specifically, a Michigan ex-felon might plausibly believe that his firearm privileges have been fully restored under Mich. Comp. Laws § 750.224f(1), yet be unaware of a "musty statute" in "a corner of the state's penal code," *Erwin*, 902 F.2d at 512–13, that limits these privileges and thereby subjects him to federal prosecution.

Yet, this Court must take the law as it finds it, and the governing decisional law of the Supreme Court and the Sixth Circuit will not permit the result urged by Defendant. First, as a factual matter, there was no single Massachusetts statute in *Caron* that both restored the petitioner's firearm privileges and also prohibited him from possessing handguns outside his home or business. Rather, as demonstrated by the District Court's opinion in *Caron*, which included a thorough analysis of Massachusetts gun laws, it is necessary to consult several statutory provisions to determine the extent to which Massachusetts restores an ex-felon's firearm privileges. *See United States v. Caron*, 941 F.Supp. 238, 249–51 (D.Mass.1996). For example, one provision allows a former felon to obtain a "firearm identification card" five years after his release from prison, another allows a firearm identification cardholder to carry a rifle or shotgun (but not a handgun) on his person or under his control in a vehicle, and still another prohibits a convicted felon from obtaining a license to carry a handgun. *See Caron*, 941 F.Supp. at 249–50 (citing Mass. Gen. L. ch. 140, §§ 129B, 131, and Mass. Gen. L. ch. 269, § 10(a)(4)); *see also United States v. Estrella*, 104 F.3d 3, 7–8 (1st Cir.) (noting the "patchwork of restrictions" Massachusetts imposes on ex-felons), *cert. denied*, 521 U.S. 1110, 117 S.Ct. 2494, 138 L.Ed.2d 1001 (1997). Indeed, the District Court in *Caron* found it necessary to consult Massachusetts case law as well to determine that a firearm identification cardholder may lawfully carry a handgun within his residence or place of business, even if he lacks a handgun license. *Caron*, 941 F.Supp. at 250 (citing state court decisions that found "an implicit exemption from criminal liability" for such activities). Thus, *Caron* cannot be distinguished on the basis of any meaningful difference in the arrangement of Massachusetts and Michigan gun laws.[25]

Next, the Sixth Circuit's rulings in *Cassidy, supra*, and *Driscoll, supra*, are flatly inconsistent with Defendant's assertion that Michigan law does not trigger the "unless" clause of § 921(a)(20) unless a single state statute both restores an ex-felon's firearm privileges and imposes limits on that restoration. In *Cassidy*, the Court found it "axiomatic that if we must look to the whole of state law in order to determine whether a felon's civil rights have been restored, as opposed to looking only to an order or certificate, we must also look to the whole of state law in order to determine if his firearms privileges have been expressly restricted." *Cassidy*, 899 F.2d at 546. Upon considering the language of § 921(a)(20) and its legislative history, the Court concluded that it was indeed necessary to consult "the whole of state law" for both purposes. 899 F.2d at 546–49.

In *Driscoll*, the Sixth Circuit revisited this question, and determined that it was bound to follow its earlier ruling in *Cassidy*. As discussed above, the *Driscoll* Court fully considered this Court's holding in *Hammonds*, which would have limited application of the final sentence of § 921(a)(20) to situations where a felon's civil rights are restored through a written document or some similar affirmative official action, but concluded that *Cassidy* foreclosed this result. *Driscoll*, 970 F.2d at 1477–78. Accordingly, *Driscoll* reiterated the rule from *Cassidy* that a court must look to "the whole of state law" in determining whether the "unless" clause of § 921(a)(20) is triggered by state-law restrictions on the firearm privileges of ex-felons. 970 F.2d at 1480; *see also Erwin*, 902 F.2d at 512–13 (rejecting the defendant's "single statute" argument as "clev-

**25.** Moreover, if one recalls that the "such ... restoration" language of § 921(a)(20) refers to the restoration of a former felon's "civil rights," and not just his firearm privileges, it is even less likely that a single state statute, whether in Michigan or elsewhere, would both restore the entire panoply of civil rights, such as the rights to vote and serve on a jury, and also expressly set forth all of the remaining restrictions on a former felon's firearm privileges.

er" but "not a plausible interpretation" of § 921(a)(20), and explaining that "[t]he last clause of § 921(a)(20) deals not with the arrangement of a state's statutes but with misleading omissions in pardons, notices of expungement, and the like").

Thus, in accordance with *Caron* and the relevant Sixth Circuit precedents, the Court looks to the whole of Michigan law, and finds that the restrictions imposed by Mich. Comp. Laws § 28.426(1) regarding concealed weapons and pistols in vehicles trigger the "unless" clause of § 921(a)(20).[26] Admittedly, the road to this result is less than direct and not wholly satisfactory.[27] Rather, as this Court anticipated in *Hammonds*, 786 F.Supp. at 663 n. 12, the "whole of state law" approach to determining whether there has been a restoration of civil rights or a continuing restriction on firearm privileges requires the courts to draw "impossible distinction[s]" based on the subtle interplay of state statutes and court rules, many of which provide no evidence of the state's intention to restore or withhold the firearm privileges of its convicted felons.

This may or may not be the result sought by Congress when it amended § 921(a)(20) in 1986. *Cf. Estrella*, 104 F.3d at 8 ("Possibly Congress never considered the case in which the ex-felon's right to own firearms was restricted in some ways but not others.") Nonetheless, given the cumulative weight of *Caron, Cassidy* and *Driscoll*, the Court believes itself bound to follow this approach in this case. Having carefully reviewed these prece-

dents, and having considered Michigan law and the facts of this case in light of this governing case law, the Court concludes that Defendant is subject to prosecution under Count II of the Indictment.

### IV. CONCLUSION

For the reasons set forth above,

IT IS HEREBY ORDERED that Defendant's Motion to Suppress is DENIED.

IT IS FURTHER ORDERED that Defendant's Motion to Dismiss Count II of the Indictment also is DENIED.

---

**26.** At least one court has suggested that a state's firearm restrictions might be so *"de minimis"* that they would not trigger the "unless" clause. *See Estrella*, 104 F.3d at 8. However, this Court cannot say that Michigan's restrictions on the places and ways a former felon may carry a pistol are any less "significant" or "substantial" than Massachusetts' restrictions on the places an ex-felon may possess a handgun. Thus, this case presents no occasion to determine whether there is a *"de minimis"* exception to the "all-or-nothing" approach adopted in *Caron*.

**27.** The Court is particularly concerned that considerations of federalism are undermined

by the result in this case, in light of the State of Michigan's fairly clear statement of its intentions regarding the restoration of a convicted felon's right to possess firearms under state law, and in light of the express language of § 921(a)(20) giving state law a role in determining whether an ex-felon is subject to prosecution under the federal felon-in-possession statute. If this Court were writing on a blank judicial slate, it would be inclined to defer to the clear dictates of Michigan law, even if the Court might not fully accept the wisdom of that law. However, as explained, binding precedent mandates a different result here.